# United States Court of Appeals
## For the First Circuit

No. 04-2584

BOLÍVAR RAMÍREZ RODRÍGUEZ,

Plaintiff, Appellant,

v.

BOEHRINGER INGELHEIM PHARMACEUTICALS, INC.,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. José Antonio Fusté, U.S. District Judge]

Before

Torruella, Lynch, and Lipez, Circuit Judges.

Godwin Aldarondo-Girald, with whom Aldarondo Girald Law Office was on brief, for appellant.
Gregory T. Usera, with whom Lourdes C. Hernández-Venegas and Schuster Usera & Aguiló LLP were on brief, for appellee.

October 7, 2005

**LIPEZ, <u>Circuit Judge</u>.** Appellant Bolívar Ramírez Rodríguez (Ramírez) filed an age discrimination claim against his former employer, Boehringer Ingelheim Pharmaceuticals, Inc. (BIPI), pursuant to the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621-634, and Puerto Rico law. The district court granted summary judgment for BIPI on the ground that Ramírez had not established a <u>prima</u> <u>facie</u> case of discrimination. Alternatively, even if he had made such a case, the district court ruled that he had not presented sufficient evidence for a jury to find that BIPI's proffered non-discriminatory reason for terminating him was pretextual. On appeal, Ramírez challenges the summary judgment order, as well as an array of rulings by the district court on evidentiary issues. We affirm on the alternative ground set forth by the district court.

**I.**

We take the following facts from the summary judgment record, presenting them in the light most favorable to the appellant and drawing all reasonable inferences in his favor. <u>See</u> <u>Gonzalez-Pina</u> v. <u>Rodriguez</u>, 407 F.3d 425, 431 (1st Cir. 2005).

Ramírez was born on March 23, 1951. He worked as a professional sales representative (PSR) for BIPI from November 1, 1977 to August 15, 2001, when he was terminated. As the district court explained, Ramirez's "principal activity" as a PSR was "promoting [BIPI's] products by conducting visits to physicians,

-2-

hospitals, and pharmacies, educating health professionals about [BIPI's] products, and providing product samples." Ramírez, like all of the PSRs, was assigned to a particular geographic territory. At the time of his termination, he was assigned to the southwest region of Puerto Rico. Relevant to this case, BIPI policy requires PSRs to obtain a signed Sample Signature Document (SSD) each time they provide drug samples to a doctor. The SSD must be completed in full in the PSR's presence. BIPI's sampling policy is designed to comply with the requirements of the Prescription Drug Marketing Act (PDMA), 21 U.S.C. §§ 301 et seq.[1]

Before 1999, Ramírez routinely received positive performance evaluations for his work. In his 1999 evaluation of Ramírez,[2] district manager Valeriano García (García) -- the BIPI

_____

[1]The PDMA regulates, inter alia, distribution of samples of prescription drugs to physicians. It permits manufacturers and authorized distributors to provide samples to licensed practitioners only upon written request "made on a form which contains the practitioner's name, address, and professional designation, the identity of the drug sample requested, the quantity of drug samples requested, the name of the manufacturer or authorized distributor of the drug sample, the date of the request and signature of the practitioner making the request." 21 U.S.C. § 353(d)(3)(A). The PDMA also requires drug manufacturers and distributors to "conduct, at least annually, a complete and accurate inventory of all drug samples in the possession of [their] representatives" and to "maintain records for at least 3 years of all drug samples distributed, destroyed, or returned to the manufacturer or distributor, of all inventories maintained under this subparagraph, of all thefts or significant losses of drug samples, and of all requests [made by a practitioner pursuant to 21 U.S.C. § 353(d)(3)(A)] for drug samples." 21 U.S.C. § 353(d)(C).

[2]Although the evaluation covered the 1999 calendar year, it was actually completed in March 2000.

District Manager for Puerto Rico and Miami, and Ramírez's direct supervisor -- rated Ramírez as meeting expectations in most areas. However, García also raised several concerns about Ramírez's performance. Specifically, García noted that Ramírez "[d]id not call on [doctors in his territory] other than [in] Ponce and Mayagüez," that he "[d]id not follow 4 week cycle plan [for visiting doctors] as instructed," and that he was "[o]ver-sampling targets and non-targets."[3] García noted similar concerns, in more detail, in an email he sent on January 31, 2000 to Antonio Hernández, another District Manager in Florida, and Noel Díaz, who was slated to assume García's duties in the Commonwealth in the newly-created position of District Manager for Puerto Rico. Although Ramírez questioned the basis for these concerns when he received his evaluation, the record does not indicate that he pursued his objections any further.

Díaz became the District Manager for Puerto Rico, and therefore Ramírez's direct supervisor, on February 28, 2000. In March 2000, BIPI informed Ramírez and the other PSRs that it was restructuring the Puerto Rico sales region to accommodate an expansion in the size of the sales force, i.e., an increase from 5

---

[3]In its brief, BIPI explains that "oversampling means the excessive distribution of drug samples to specific doctors." The primary reason BIPI writes its policies to prevent oversampling is that "it would permit certain doctors to obtain more samples than are necessary for their practice, thus opening the door to illegal sample distribution and/or sales."

PSRs to 7 PSRs.  As a result of the restructuring, Ramírez lost the city of Ponce and gained the municipality of Arecibo.

Also in March 2000, Díaz asserted that Ramírez had failed to timely renew his car registration and driver's license and therefore was driving his company car without valid documentation. As a result of Díaz's assertion, Ramírez also received an admonishing email from Larry Wood, BIPI's Regional Director for the Southeast Region.  Ramírez responded by submitting evidence that he had renewed both his license and registration on time.  In a letter to Wood, Ramírez described the accusations as "baseless and only launched with ulterior motives as part of a personal agenda to terminate my employment."

On April 5, 2000, while the dispute regarding the license and registration was ongoing, Ramírez suffered a stroke. Attributing the stroke to the stress of an argument with Díaz, Ramírez applied for treatment under the State Insurance Fund, Puerto Rico's workmen's compensation program.

On April 6, 2000, Díaz reported to Wood additional concerns about Ramírez's sampling practices.  Specifically, in an email to Wood, Díaz reported that (1) Ramírez's physician database was composed largely of primary care physicians rather than the sub-specialists who would be expected to receive a large proportion of samples, (2) 50% of the physician listings in the database had only postal, not physical, addresses, and (3) Ramírez did not

appear to be contacting important specialized physicians. Díaz also reported talking to two cardiologists who had asked Ramírez not to return to their offices after he asked them to sign confirmation documents, i.e., SSDs, that overstated the number of samples that he had provided. In the email, Díaz speculated that Ramírez was "maintain[ing] a base of physicians that allow him to dump large amounts of samples. In return he gets four or five signed slips without date. He then allocates the signed slips on a monthly basis and enters them accordingly to the system." Díaz also expressed concerns about Ramírez's storage of samples.

On May 8, 2000, Wood sent a letter instructing Ramírez to move his samples within five days from his mother's house to a commercial storage facility. Acknowledging that Ramírez was on short-term disability leave, Wood offered to arrange for the samples to be moved if Ramírez was unable to transport them himself. At the time, Ramírez was the only PSR in Puerto Rico who did not store his samples in a commercial facility. In a letter dated May 19, 2000, Ramírez responded that his previous District Manager had approved the storage arrangement. In the letter, Ramírez also noted that he felt "persecuted, harassed and discriminated by Mr. Noel Díaz because of my age and time with the company."[4] Wood replied to Ramírez's letter on June 9, 2000. He

_____

[4]Ramírez again described Díaz as harassing him in a June 7, 2000 letter to Wood regarding the dispute over whether Ramírez had timely renewed his driver's license.

assured Ramírez that he would investigate the claims of persecution, harassment and discrimination, but reiterated that Ramírez had to move his samples. Wood also cautioned that "failure to follow my directive may constitute insubordination, which can result in disciplinary action up to, and including, termination." Ramírez ultimately moved the samples.

Wood and Ramírez met on July 13, 2000 to discuss Ramírez's complaints of harassment and discrimination. In a letter dated September 19, 2000, Wood indicated that "both prior and subsequent to our July 13th meeting, I conducted an investigation of your allegations of discrimination and harassment. Please be advised that after careful investigation, I found no support for your allegations that you have been subject to discriminatory or harassing behavior by [Díaz] or by any Company employee."

On October 6, 2000, BIPI informed Ramírez that he would be laid off as of October 13, 2000 because his short-term disability benefits were expiring and he had not "provided documentation that enables [his] return to work." On October 10, 2000, Ramírez informed Díaz that he had received authorization from the State Insurance Fund to return to work the following day. Accordingly, Ramírez returned to work from short-term disability leave on October 11, 2000.

Díaz, Hernández, and Wood met with Ramírez on October 20, 2000 to outline a series of directives with which Ramírez had to

comply upon returning to work and to establish deadlines for completion of those directives. On May 10, 2001, Díaz informed Wood that he and Hernández had visited several doctors in Ramírez's sales territory and that the doctors had reported irregularities in Ramírez's sampling practice. According to Díaz, the doctors reported that Ramírez left blank SSDs to be signed outside his presence or asked them to sign undated SSDs, both violations of BIPI policy, which is designed to ensure compliance with federal regulations.

Also on May 10, 2001, Ramírez asserted that pursuant to an order by Díaz, he had not received any literature or promotional materials since December 2000. In a letter to Wood, Díaz responded that he had arranged to stop delivery of promotional materials and samples to Ramírez while he was on short-term disability leave. Díaz maintained that Ramírez "started to receive his normal shipments" upon his return to work in October 2000 and that he did not know why Ramírez had not received his December 2000 order. Díaz also indicated that he had again arranged to stop delivery of samples and material to Ramírez as of May 10, 2001 based on the doctors' reports regarding Ramírez's sampling practices.

On June 13, 2001, Ramírez filed a claim with the Anti-Discrimination Unit of the Puerto Rico Department of Labor (ADU), alleging that Díaz

> began a series of harassing acts against me [in February 2000] . . . due to my age. These acts on the part of the

company, by means of [Díaz and Wood], consisted in changing my sales region in a manner which was disadvantageous to myself . . .; forcing to change the place of storing my samples to Ponce, in spite of the fact that my residence and seat of operations is in Mayaguez; make or promote accusations of insubordination when I complained about the treatment that I was receiving; false pointing out of negligence in the use of my car and improper intervention with my treatment by the State Insurance Fund . . . [w]hen I was in my disability caused by a stroke [that] occurred during a heavy discussion with Mr. Díaz.

During August 2001, Díaz continued to investigate Ramírez's sampling practices. On August 15, 2001, Ramírez was terminated. In a letter confirming Ramírez's termination, Wood attributed the decision to his "violation of the Prescription Drug Marketing Act and Company policy as it relates to sample distribution and documentation." Following his termination, Ramírez amended his ADU claim to include a charge of retaliation.

Ramírez filed the present suit in the federal district court for the District of Puerto Rico on August 20, 2002, alleging violations of the ADEA and Puerto Rico law. BIPI filed a motion for summary judgment on February 9, 2004, and Ramírez filed an opposition to the motion on April 2, 2004. On September 24, 2004, the court found that Ramírez had not established a prima facie case of age discrimination and that, even if Ramírez had made his prima facie case, he had not demonstrated that BIPI's asserted non-discriminatory reason for terminating him -- i.e., violations of the PDMA and company sampling policies -- was pretextual. The court also found that Ramírez's retaliation claim was flawed for

essentially the same reasons, namely that he had not made a prima facie showing that he was dismissed in retaliation for filing a claim with the ADU and that, even if he could make such a prima facie showing, he had not established that BIPI's asserted non-discriminatory reason for firing him was pretextual. Accordingly, the court granted summary judgment for BIPI on all claims. This appeal followed.

## II.

On appeal, Ramírez challenges not only the merits of the district court's summary judgment ruling, but also its handling of several discovery and evidentiary issues. We turn to those preliminary issues first.

## A.        Motion to compel discovery

In defending against the claim of discrimination and retaliation, BIPI has asserted that it terminated Ramírez solely because of violations of the PDMA and company sampling policy. This claim of violations rests on written statements by three physicians regarding Ramírez's improper sampling practices. Although BIPI disclosed the statements to Ramírez during discovery, it did so only after redacting the physicians' names and addresses, citing the physicians' concerns that Ramírez might seek reprisal against them if he learned their identities. Ramírez filed a motion to compel discovery of the identifying information, arguing that he had a right to "know all the details related to th[e]

statements, and to depose, if necessary, those physicians who allegedly prepared said statements." BIPI opposed the motion and sought a protective order. The district court denied the motion to compel and granted the protective order. On appeal, Ramírez assigns error to the denial of his motion to compel and the corresponding grant of a protective order. Reviewing the court's ruling under the deferential abuse of discretion standard, see Ayala-Gerena v. Bristol Myers-Squibb Co., 95 F.3d 86, 91 (1st Cir. 1996), we reject Ramírez's claim.

Rule 26(c) of the Federal Rules of Civil Procedure permits the district court to grant a protective order in the discovery context for "good cause shown." The district court explained that it was granting BIPI's request for protection to "safeguard what appears to be a legitimate concern for defendant," i.e., the physicians' fear of reprisal by Ramírez. Ramírez challenges the court's explanation on the grounds that BIPI "did not submit any supporting document or specific fact to sustain the [physicians'] alleged 'fears'" of reprisal, and therefore did not show good cause for the order. He further faults the district court for "fail[ing] to discuss whether the producing party's burden of production and its interests outweighed the opposing party's right to obtain the information sought."

While it perhaps would have been preferable for the district court to explain its decision to grant a protective order

in more depth, see United States v. Microsoft Corp., 165 F.3d 952, 959-60 (D.C. Cir. 1999) (noting that Rule 26(c) requires "an individualized balancing of the many interests that may be present in a particular case"), its failure to do so does not affect our analysis. FDIC v. Ogden Corp., 202 F.3d 454, 460 (1st Cir. 2000) (noting that "[w]e have thus far refused to insist upon a rigid rule" precluding summary disposition of pre-trial discovery motions). As we have repeatedly stated, "[i]t is well settled that the trial judge has broad discretion in ruling on pre-trial management matters." Ayala-Gerena, 95 F.3d at 91. Here, the court used its discretion to craft an order tailored to the situation it faced. Although that order denied Ramírez access to the physicians' identifying information, the court indicated that the order was merely a "temporary remedy . . . [that] may be modified if adequate safeguards are offered" and specifically invited Ramírez's counsel to "propose to the court alternatives to safeguard what appears to be a legitimate concern for defendant." The court also emphasized that it "remains open to solutions." In short, the court did not treat its protective order as definitively precluding Ramírez from engaging in further discovery regarding the statements. Rather, the court expressed a willingness to work with Ramírez to balance the physicians' privacy and safety concerns with his interest in conducting discovery.

Notwithstanding the court's explicit invitation, Ramírez does not appear to have suggested any alternative methods by which he could conduct discovery regarding the physician statements. The reason for this omission is not clear from the record. If Ramírez felt that he did not have enough time to respond to the court's invitation before addressing BIPI's motion for summary judgment -- which was pending when the court issued the protective order[5] -- he could have informed the court of his situation by means of a motion under Federal Rule of Civil Procedure 56(f).[6] It is undisputed that he did not file such a motion. Instead, Ramírez filed a motion in limine with his opposition to the summary judgment motion, seeking to exclude the physicians' statements entirely on the ground that he had been "denied his right to discover relevant information and to confront the alleged evidence in which Defendant

_____

[5]We supply the following dates to provide a brief chronology of the discovery dispute. Ramírez filed his motion to compel discovery on December 5, 2003. BIPI requested the protective order on January 16, 2004. Ramírez filed his opposition to BIPI's request on January 28, 2004. BIPI submitted the physician statements to the court under seal on January 29, 2004. Ramírez opposed the filing under seal on February 3, 2004. BIPI filed a motion for summary judgment on February 9, 2004, while the motions regarding the physician statements were still pending. The court granted the protective order on March 3, 2004. Ramírez filed his opposition to summary judgment, along with a motion in limine seeking to exclude the physician statements, on March 31, 2004.

[6]"Should it appear from the affidavits of a party opposing the motion [for summary judgment] that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance . . . or may make such other order as is just."

-13-

attempts to sustain its nondiscriminatory reason to discharge him." Nowhere in the motion in limine did Ramírez acknowledge the court's willingness to consider alternative avenues by which he could discover information relating to the statements or request more time to proffer such alternatives.

It is troubling that Ramirez did not have an opportunity to challenge the doctor's accounts that led to his termination. While this case is not about whether the statements are true or not, see infra Section II.B.2, evidence of falsity would be relevant to a claim that BIPI's professed reliance on the statements was a pretext for age discrimination. Ramírez, however, bears substantial responsibility for his own predicament because of his failure to respond to the court's invitation for proposals for modification of the protective order. In light of Ramírez's failure to take advantage of this opportunity, his claim that the court abused its discretion in denying his motion to compel discovery and granting the protective order rings hollow. Cf. Mass. Sch. of Law at Andover, Inc. v. Am. Bar Ass'n, 142 F.3d 26, 45 (1st Cir. 1998) ("A party relying on Rule 56(f) must demonstrate that he exercised due diligence in pursuing discovery."); Springfield Terminal Ry. v. Can. Pac. Ltd., 133 F.3d 103, 109 (1st Cir. 1997) (cautioning that "failure to resort to such first aid [as Fed. R. Civ. P. 56(f)] will ordinarily bar belated aid").

**B.       Motion in limine**

As noted, Ramírez filed a motion in limine, concurrently with his opposition to summary judgment, seeking to exclude the physicians' statements and other evidence as inadmissible under the Federal Rules of Evidence.   Ramírez asserts that the court implicitly rejected the motion by considering the disputed evidence in its order granting summary judgment, and that the rejection was erroneous.   We review for an abuse of discretion.   White v. N.H. Dep't of Corr., 221 F.3d 254, 262 (1st Cir. 2000).

1. Evidence at issue

In his motion in limine, Ramírez sought to exclude evidence relating to his alleged sampling irregularities in 1999 and the unidentified physicians' statements, as described below.[7]

a. Sales report

BIPI's Proposed Statement of Uncontested Facts included the following assertions:

---

[7]Ramírez also sought to exclude a sentence in BIPI's proposed statement of uncontested facts relating to BIPI's decision to terminate another PSR, Zoe Corretjer, for "similar reasons as those that led to plaintiff's termination."   Ramírez asserts on appeal that the district court abused its discretion in denying his motion with regard to that sentence. We need not reach this claim.   There is no indication in the record that the court denied the motion to exclude the statement regarding Corretjer's termination.   To the contrary, given that the district court did not refer to Corretjer's termination in its order granting summary judgment, it appears that the court granted that aspect of Ramírez's motion in limine.

-15-

15. On January 19, 2000, [Ramírez's then-supervisor] Garcia made an email request to [BIPI sales analyst] Rita Riberio, to provide him with the total amount of samples given of each product by each sales representative in Puerto Rico during 1999. Riberio answered said inquiry, also [by] email, on January 28, 2000. . . .

16. The information provided by Riberio indicated peculiarities with several PSRs, including Ramírez. . . . This information led García to conclude that plaintiff could be incurring in the practice known in the industry as "oversampling," and that he may not be complying with his assigned territory. On January 31, 2000, [García] communicated these concerns by email to Antonio Hernández, District Manager in Florida, and Noel Díaz, who would shortly become District Manager in Puerto Rico. . . .

. . .

23. During a meeting held on March 28, 2000 in Miami, Noel Díaz discussed his concerns regarding Valeriano García's January 2000 communications in connection with plaintiff's apparent oversampling with Larry Wood, BIPI's Regional Director for the Southeast Region of the United States. Díaz decided to investigate the matter further, as suggested by García. . . .

. . .

28. . . . On April 6, 2000, Díaz reported that he identified additional concerns about plaintiff's practices that arose during the course of Díaz's field work with plaintiff and an additional set of numbers generated by Rita Riberio.

Riberio's January 28 response to García's request for information was among the exhibits appended to the Proposed Statement of Uncontested Facts.

Ramírez asserts that Riberio's response -- which was in the form of a data report[8] -- is inadmissible hearsay, and that the court should therefore have excluded both the response and Proposed Statements 15, 16, 23, and 28, which Ramírez asserts are all related to it.

b. Physicians' statements

Ramírez also sought to exclude BIPI's Proposed Statements 29, 30, 41, 42, 44, and 47 on the ground that they "refer to information obtained by Mr. Noel Díaz and Mr. Antonio Hernández from alleged visits and communications with several doctors" whose identifying information was not disclosed to Ramírez. On appeal, Ramírez continues to assert that because he was not able to conduct discovery regarding the identity of the physicians, the physician statements are inadmissible hearsay and the corresponding statements must be deleted from BIPI's proposed statement of uncontested facts.[9]

---

[8]Ramírez also sought to exclude the cover memo that Riberio sent to García with the report. The memo merely states that her results were attached and that García was free to "share this information with [his colleagues] if you think they could use it." For ease of reference, we use the term "report" as a short hand for both the report and the cover memo.

[9]We note that not all of the proposed statements of uncontested facts identified by Ramírez actually rely on the statements by unidentified physicians. Proposed statements 29 and 30 do not cite the redacted physicians' statements, but rather cite an April 6, 2000 email from Díaz to Wood in which Díaz reported talking to two physicians who had asked Ramírez not to return to their offices as a result of irregularities in his sampling

2. <u>Hearsay claim</u>

On appeal, Ramírez asserts that the evidence and statements that we have just described constitute inadmissible hearsay. "'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c). Hearsay evidence is not admissible at trial, <u>see</u> Fed. R. Evid. 802, or for summary judgment purposes, <u>see</u> <u>Vazquez</u> v. <u>Lopez-Rosario</u>, 134 F.3d 28, 33 (1st Cir. 1998), unless it falls within one of the exceptions specified in the Federal Rules of Evidence. <u>See</u> Fed. R. Evid. 802. In Ramírez's view, none of the evidence that he seeks to exclude is covered by a hearsay exception.

At the risk of stating the obvious, whether a particular statement falls within a hearsay exception is relevant only if the statement is, in fact, hearsay. We must therefore consider, as an initial matter, whether any of the evidence at issue -- either Riberio's report or the physician statements -- is hearsay. By definition, hearsay is a statement "offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c). BIPI

practice. The email, which was appended to BIPI's proposed statement of uncontested facts as Exhibit 10, identified the physicians by name and provided their addresses and phone numbers. For reasons that are unclear to us, neither party has referred to this email on appeal.

-18-

asserts that it did not offer the evidence at issue to prove the truth of the matter asserted.  We agree.

The "matter asserted" in both Riberio's report and the physician statements is essentially that Ramírez's sampling practice was inconsistent with company policy and the PDMA.  The company offers these assertions to explain the basis for its decision to terminate Ramírez from his employment.  That explanation alone has evidentiary significance.  See Zapata-Matos v. Reckitt & Colman, Inc., 277 F.3d 40, 44 (1st Cir. 2002) (noting that in an employment discrimination case, "once the plaintiff has met the low standard of showing prima facie discrimination, the employer must articulate a legitimate nondiscriminatory reason [for the adverse employment action] in response").  In short, the report and physician statements were not offered to prove that Ramírez engaged in misconduct, but rather to demonstrate that his superiors had reason, based on a thorough investigation, to believe that he had.

In an attempt to rescue his claim, Ramírez asserts that Ribiero's report and the physician statements were, in fact, submitted to demonstrate that Ramírez violated company and industry-wide sampling policies, i.e., for the truth of the matter asserted.  He maintains that BIPI has defended its decision to terminate him on the grounds that he engaged in such misconduct, rather than on the more nuanced ground that it thought he had

-19-

engaged in such misconduct. We reject this reasoning. Although BIPI may have framed its argument inconsistently at times, it explained in its motion for summary judgment that "the results of [the] investigation into plaintiff's sampling practices . . . led to the conclusion that plaintiff had incurred in serious violations of the PDMA and Company policies." BIPI further explained, in opposing Ramírez's motion in limine, that the evidence at issue was "not being offered to prove that the plaintiff in fact engaged in the practice of over-sampling or violated company policies, but to show that this was the information defendant had before it and that defendant considered this information when it made its decision to terminate plaintiff's employment." In short, BIPI has defended its decision on the grounds that it thought, based on its investigation, that Ramírez had engaged in misconduct.[10]

---

[10]Through his motion in limine, Ramírez also sought to exclude Ribiero's report and the physician statements pursuant to Federal Rule of Evidence 403, which provides, in part, that, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." On appeal, Ramírez asserts that the district court abused its discretion under Rule 403 by considering Ribiero's report and the physicians' statements before ruling in its summary judgment order. We disagree. Although "courts also have the power to exclude evidence under Rule 403 at the summary judgment stage," see Jack B. Weinstein & Margaret A. Berger, 2 Weinstein's Federal Evidence § 403.02[1][b] (2d ed. 2005), Ramírez has not demonstrated that the evidence he seeks to exclude meets the "unfair prejudice" standard set forth in that rule.

Ramírez challenges the court's grant of summary judgment for BIPI on his age discrimination claim.  Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).

Under the ADEA, it is "unlawful for an employer . . . to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age."  29 U.S.C. § 623(a)(1).  The district court properly considered Ramírez's ADEA claim under the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05 (1973):

> once the plaintiff has met the low standard of showing prima facie discrimination, the employer must articulate a legitimate nondiscriminatory reason in response.  Once that reason is articulated, the presumption of discrimination drops out of the picture, the McDonnell Douglas framework with its presumptions and burdens disappears, and the sole remaining issue is of discrimination vel non.

Zapata-Matos, 277 F.3d at 44-45 (internal citations omitted).[11]

---

[11]The prima facie showing of discrimination under McDonnell Douglas has four components:

> An ADEA claimant must adduce evidence that (1) she was at least forty years of age; (2) her job performance met the employer's legitimate expectations; (3) the employer

-21-

Having reviewed the relevant legal framework,[12] we turn to the specific facts of the case at hand. Instead of evaluating Ramírez's prima facie case, as the district court did, we assume arguendo that Ramírez has made out a prima facie case of discrimination based on age. In response, BIPI has articulated a legitimate, nondiscriminatory reason for its decision to terminate Ramírez's employment--namely, its conclusion, based on the results of an investigation, that Ramírez's sampling practices violated the PDMA and company policy.[13] At this stage, then, "[t]he question to

---

subjected her to an adverse employment action (e.g., an actual or constructive discharge); and (4) the employer had a continuing need for the services provided by the position from which the claimant was discharged.

Gonzalez v. El Dia, Inc., 304 F.3d 63, 68 n.5 (1st Cir. 2002).

[12]On appeal, Ramírez asserts for the first time that the district court should have considered his claim not only under the McDonnell Douglas framework, but also under the standards set forth in Desert Palace, Inc. v. Costa, 539 U.S. 90 (2003) for mixed-motive employment discrimination claims, i.e., claims that "both legitimate and illegitimate reasons motivated the [adverse employment] decision." Id. at 93. Because Ramírez failed to advance this argument in the district court, we consider it waived. See Hillstrom v. Best W. TLC Hotel, 354 F.3d 27, 31 (1st Cir. 2003) (expressing doubt that the plaintiff had preserved claim that Desert Palace applied to his ADEA suit, "as he never suggested to the district court that he was presenting a mixed-motive case"); Davis v. Lucent Techs., Inc., 251 F.3d 227, 232 (1st Cir. 2001) ("[W]here a plaintiff fails to present arguments to the district court in opposition to a defendant's motion for summary judgment, we have refused to consider those arguments for the first time on appeal.").

[13]The physician statements whose admissibility we discussed in Section II reported that Ramírez usually left a large amount of samples and asked the physicians to sign multiple sample signature documents.

be resolved is whether the defendant's explanation of its conduct, together with any other evidence, could reasonably be seen by a jury not only to be false but to suggest an age-driven animus." Ronda-Perez v. Banco Bilbao Vizcaya Argentaria -- P.R., 404 F.3d 42, 44 (1st Cir. 2005). Urging us to answer this question in the affirmative, Ramírez asserts that BIPI's articulated reason for his termination was false and alleges that several aspects of BIPI's conduct reveal a discriminatory animus based on age. We examine these claims.

## A.        Territory reorganization

In March 2000, BIPI realigned the sales territories in Puerto Rico to accommodate an expansion of its sales force from five PSRs to seven PSRs. Ramírez asserts that the realignment had a negative impact on him and another PSR, Félix Ruiz, who was 58 years old at the time, and that the more desirable territories were given to the new 28- and 35-year old PSRs.[14] Ramírez focuses on the

_____

[14]BIPI contends that Ramírez's claim regarding the 2000 reorganization "is time-barred, inasmuch as it is a discrete act which occurred more than 300 days prior to his filing of the ADU charge." This contention is a reference to 29 U.S.C. § 626(d)(2), which establishes a 300-day filing period for claims under the ADEA in "deferral states" including Puerto Rico. Am. Airlines, Inc. v. Cardoza-Rodriguez, 133 F.3d 111, 122 (1st Cir. 1998). It is true that the March 2000 territory reorganization occurred more than 300 days before Ramírez filed his ADU claim on June 13, 2001. We do not view Ramírez's reference to the reorganization as an attempt to recover for a discrete act, however, but rather as part of his effort to demonstrate that BIPI's stated reason for his termination was pretextual. The 300-day statute of limitations does not "bar an employee from using the prior acts as background evidence in support of a timely claim." Nat'l R.R. Passenger Corp. v. Morgan,

fact that Ponce was removed from his territory and replaced with Arecibo, which has fewer specialists spread over a wider geographical area. He emphasizes that his new territory had 88 specialists and Ruiz's had 82 specialists, while the 28- and 35-year-old PSRs' territories had 208 specialists and 121 specialists, respectively. While acknowledging that territories had been reorganized, and that Ponce had been removed from his territory before, Ramírez asserts that "the process followed in prior reorganizations was different. Appellant and Mr. Félix Ruiz were consulted, and all changes were discussed with them prior to becoming in effect. . . . The 2000 reorganization was [behind] closed doors." Together, Ramírez asserts, this evidence is sufficient to create a dispute of material fact as to whether the reorganization reflected a discriminatory animus. We disagree.

Ramírez has conceded that BIPI has reorganized its territories in the past and that Ponce was removed from his territory in 1995. Although he has not explained the circumstances of the 1995 removal, it is notable that he does not assert that the 1995 removal was motivated by a discriminatory animus. The only difference he cites between prior reorganizations and the 2000

---

536 U.S. 101, 113 (2002) (discussing an analogous 300-day time bar for claims brought under Title VII); see Mercado v. Ritz-Carlton San Juan, 410 F.3d 41, 47 (1st Cir. 2005) (noting that "we have held repeatedly that the ADEA and Title VII stand[ ] in pari passu and that judicial precedents interpreting one such statute [are] instructive in decisions involving [the other]") (internal quotation marks omitted) (alterations in original).

reorganization is that during prior reorganizations, PSRs were consulted and that new employees were given less complex territories. The fact that PSRs were not consulted before the 2000 reorganization is not evidence that the reorganization was carried out in a discriminatory way. Nor has Ramírez offered evidence that the 2000 reorganization was a deviation from BIPI's policy -- if BIPI had such a policy in the first place -- of assigning less complex territories to newer PSRs. He has pointed out only that the newly created territories had more specialists than his, not that they were somehow more complex.

B.        **Discriminatory comments**

Ramírez asserts that Díaz, his supervisor at the time of his termination, Valeriano García, the district manager who supervised Ramírez prior to Díaz, and Antonio Hernández, a district manager in Florida, made comments that reflect a discriminatory animus and therefore support a finding that BIPI's articulated reason for his termination was pretextual. The district court, quoting Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 55 (1st Cir. 2000), recognized that "[d]iscriminatory comments may be probative of pretext if a plaintiff can 'show that discriminatory comments were made by the key decisionmaker or those in a position to influence the decisionmaker.'" The court concluded, however, that "[g]iven Defendant's compelling stated reason for Plaintiff's termination, the[] stray remarks [cited by

-25-

Ramírez] do not permit the inference that Defendant's real motivation for Plaintiff's discharge was age discrimination."

On appeal, Ramírez asserts that in considering the allegedly discriminatory comments, the district court failed to view the evidence in the light most favorable to him, and instead "weighted the evidence in favor of the appellee." We consider this argument with regard to each of the comments that Ramírez has identified as discriminatory.

1. "Sacred cows"

Relying on the deposition testimony of PSR Rafael Oliver, Ramírez asserts that during a private meeting on January 12, 2000, Díaz told Oliver and another PSR, Rommel Barnacet, "that he (Mr. Díaz) had orders to 'cut off' the heads of older sales representatives that Mr. Díaz, Mr. Rommel Barnacet, and Mr. Oliver called 'the sacred cows,' but that they should keep this information secret." This description does not accurately reflect Oliver's testimony, which was that Díaz said that he had instructions to cut off the heads of some "sacred cows," not of "older sales representatives." It was Oliver who interpreted the comment as a reference to age.[15] Oliver also testified that he was

---

[15]BIPI asserts that Oliver's testimony regarding his interpretation of the "sacred cow" comment is inadmissible because it reflects "mere conjecture as to what someone may have meant." We reject this claim, concluding that Oliver's interpretation of the comment was admissible as opinion testimony by a lay witness. See Fed. R. Evid. 701.

-26-

considered a "sacred cow" because he was disabled, but that Barnacet, who was five years younger than Oliver, was not a sacred cow. Nevertheless, given the summary judgment posture of this case, we conclude that the district court erred in disregarding the "sacred cows" comment altogether. Oliver testified that he understood "sacred cows" as a reference to the oldest PSRs in terms of both seniority and age. Drawing all reasonable inferences in favor of Ramírez, we think that a jury relying on Oliver's testimony could interpret Díaz's comment as a reference to age.

In a related vein, Ramírez also emphasizes the deposition testimony of Ruiz that during a meeting on February 28, 2000, Díaz stated that he had "instructions from management that they had to 'cut off the heads' of the oldest representatives."[16] This testimony, like Oliver's testimony, is somewhat ambiguous. It appears that Ruiz described only the instruction to "cut off the heads" as a quote from Díaz. We cannot tell from the testimony whether Díaz referred specifically to "the oldest representatives," or if Díaz made a different reference that Ruiz interpreted as a reference to age, as was the case with Oliver. Again, however, given the posture of this case, we recognize that a jury could interpret the comment as a reference to age.

---

[16]The district court did not directly address this testimony.

-27-

2. Employee salary

According to the deposition testimony of PSR Rafael Oliver, "there were always comments" from García and Hernández to the effect that "you have to pay two [employees] in their twenties less than one in his fifties because of what is being earned. That with that salary they would pay two, or they would pay two and a half." Ramírez cites this statement as evidence that "Mr. Díaz, Mr. Hernández, and Mr. García preferred young sales representatives," and therefore that he was terminated because of his age. Even if this statement does reflect age bias (the inference most favorable to Ramírez), Ramírez has cited no evidence on appeal that either Hernández or García -- as opposed to Díaz, his direct supervisor -- was involved in the decision to terminate him.[17] "[S]tatements made either by nondecisionmakers[,] or by decisionmakers not involved in the decisional process, normally are insufficient, standing alone, to establish either pretext or the requisite discriminatory animus." Gonzalez v. El Dia, Inc., 304 F.3d 63, 69 (1st Cir. 2002).

_____

[17]In a motion opposing summary judgment, Ramírez asserted that comments by García and Hernández were probative of discriminatory animus because "García was Plaintiff's supervisor and allegedly began the so called investigation in the year 2000" and "Hernández acted as Regional Director, he was notified of Plaintiff's alleged violations and participated in Plaintiff's supervision." Neither of these assertions address the role of García and Hernández in the decision to terminate Ramírez in August 2001.

-28-

### 3. "Twilight zone"

In his deposition, Ramírez testified that Hernández said that "[t]hose old guys are in the 'twilight zone.'" As the district court pointed out, however, Ramírez has not explained when, or in what context, he heard the statement. Moreover, as the district court also noted, "[w]hile Mr. Oliver [also] claims that Mr. Hernández stated that 'these people are in the twilight zone' after meetings with unnamed employees, notably, Mr. Oliver's quote makes no reference to age." To the contrary, Oliver interpreted the "twilight zone" comment as referring to people who did not meet their sales quotas. More importantly, as we have already noted, Ramírez cites no evidence on appeal to demonstrate that Hernández was involved in the decision to terminate him. See id.

### C.       Disparate treatment

Ramírez asserts that he was subjected to adverse disparate treatment that revealed a discriminatory animus on the part of his superiors. The district court rejected this contention, concluding that it rested on "unsupported allegations."

### 1. Employee discipline

Ramírez contends that BIPI has a disciplinary procedure requiring "progressive discipline before termination or discharge" and that the procedure was not followed in his case. He further asserts that other employees "did not use the proper sampling and

targeting procedures" but that "no one else was disciplined, much less discharged."

It is true that BIPI's employee manual sets forth a procedure to "monitor consistent non-compliance" with the rules established for ensuring sampling accountability. However, the manual also sets forth a series of "unacceptable" practices that "will result in varying levels of disciplinary action up to and including termination." (Emphasis added.) One of the practices listed is "any violation of the Prescription Drug Marketing Act of 1987," the ground that BIPI has cited for Ramírez's termination. Moreover, the manual also cautions that "[t]ermination of employment can result . . . in the event of any breach of discipline or job standards which is deemed serious enough." BIPI apparently concluded that Ramírez's perceived violations of the PDMA and company policies designed to comply with that Act were "serious enough" to result in termination, rather than a lesser sanction. It is not our role to second-guess the merits of that conclusion. See Mesnick v. Gen. Elec. Co., 950 F.2d 816, 825 (1st Cir. 1991) ("Courts may not sit as super personnel departments, assessing the merits -- or even the rationality -- of employers' nondiscriminatory business decisions.").

Although Ramírez asserts that other employees did not use proper sampling procedures but were not disciplined, he has not identified any employee who engaged in sampling violations akin to

those for which he was terminated. The closest Ramírez comes is an allegation that García, his former supervisor, "gave orders to use un-approved and illegal materials." The documents to which Ramírez cites in support of this proposition are far from clear, however, and they do not indicate whether, if García did violate company policy designed to comply with the PDMA, decisionmakers at BIPI were aware of the violation. Accordingly, we reject Ramírez's claim that his termination reflects disparate treatment based on his age.

### 2. Salary

Ramírez did not receive a merit-based salary increase for the year 2001, while all other PSRs did. In an email informing Ramírez of the salary decision, Díaz explained that

> merit increases are based on the sales and general performance of any given representative during a one year period. The guideline for the year 2000 was 4.0%. Unfortunately your extended leave of absence due to Short Term Disability did not allow a fair evaluation period to make the merit assessment for the year. Therefore the decision has been made to leave your year 2000 base pay unchanged at $63,500.00 for the year 2001.

In his motion opposing summary judgment, and again on appeal, Ramírez asserts the denial of a salary increase violated company policy. Contrary to Ramírez's representation, however, company policy does not establish that "any employee on leave will receive a salary increase in proportion to the time worked." Rather, it provides that "[i]f approved, a proratum will apply to all annual merit reviews when issued for less than a 12 month salary cycle"

and that "[t]he amount of your merit increase, if any, is discretionary." (Emphasis added.) BIPI did not approve a merit-based increase for 2001 because it was unable to evaluate Ramírez's performance for 2000. Company policy therefore did not require an increase in proportion to the time worked.

Ramírez asserts that the denial of a salary increase reflects disparate treatment nonetheless because, unlike Ramírez, PSR Oliver received salary increases while on short-term disability. The only evidence that Ramírez cites for this proposition is his own "unsworn statement under penalty of perjury." While the document that Ramírez cites is admissible for summary judgment purposes despite being unsworn, see Goldman, Antonetti, Ferraiuoli, Axtmayer & Hertell v. Medfit Int'l, Inc., 982 F.2d 686, 689-90 (1st Cir. 1993), his specific statement about Oliver's salary is inadmissible because Ramírez does not explain the basis for his knowledge. See Fed. R. Civ. P. 56(e); Cloutier v. Costco Wholesale Corp., 390 F.3d 126, 137 (1st Cir. 2004), cert. denied, 125 S. Ct. 2940 (2005). We therefore cannot credit Ramírez's claim.

### 3. Conditions upon return from short-term disability

Finally, Ramírez asserts that he was singled out for adverse disparate treatment upon his return from short term disability, when BIPI imposed "work rules, conditions, and examinations not required [of] other [PSRs]." The only sources

-32-

that Ramírez cites for his contention that similar requirements were not imposed on other PSRs are his own deposition testimony to that effect and a letter that he wrote to Díaz regarding his compliance with the conditions, in which he asserted that after speaking with Ruiz and Oliver, he learned that "after their short term disability, they were never required to comply with these directives or similar directives."  This evidence does not help Ramírez.  First, the statements of Ruiz and Oliver are inadmissible hearsay.  See Fed. R. Evid. 801(c), 802.  Second, even if the evidence were admissible, it still does not establish that Ramírez was subjected to adverse disparate treatment based on his age.  As Ramírez's own statements indicate, Ruiz -- who is eight years older than Ramírez -- was not subjected to similar treatment.[18]

## D.        Falsity of stated reason

Ramírez also alleges that BIPI falsified the physicians' statements or requested them only after it had made the decision to

---

[18]Ramírez also asserts in passing that he was subjected to disparate treatment when Wood instructed him to store his samples in a commercial storage facility rather than at his mother's house. Emphasizing that he stored samples at his mother's house -- with his District Manager's approval -- for many years prior to April 2000, Ramírez points out that BIPI's storage policy does not actually require samples to be kept in a commercial facility. While that may be the case, there is no evidence to support Ramírez's contention that the order to move his samples reflected a discriminatory animus. Before Wood's order, Ramírez was the only PSR in Puerto Rico who did not store his samples in a commercial facility. By requiring him to move his samples to such a facility, Wood was merely putting Ramírez in the same position as all of the other PSRs.

terminate him. He has provided no evidence, however, to substantiate those allegations, see Fed. R. Civ. P. 56(e) (cautioning that "[w]hen a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading"),[19] and the evidence that is in the record supports a finding that BIPI did not fabricate its articulated reason for terminating Ramírez's employment.

In a letter confirming Ramírez's termination, BIPI attributed its decision to Ramírez's "violation of the Prescription Drug Marketing Act and Company policy as it relates to sample distribution and documentation." BIPI has produced the physicians' statements that led it to this conclusion, which it has articulated consistently throughout the course of this litigation. See Zapata-Matos, 277 F.3d at 47 (emphasizing that explanations by representatives of an employer for their decision to terminate the plaintiff "are themselves consistent and not contradicted by either contemporaneous documents or statements made at termination, or statements made later"). As the district court recognized, BIPI also proffered evidence of other "perceived irregularities in Plaintiff's sales practice" dating back several years, as well as

---

[19]Although Ramírez was hampered in that effort by his inability to conduct discovery regarding the physicians' identities, he bears substantial responsibility for that limitation, as we have discussed.

evidence of its investigation into the irregularities. The record thus presents no basis for a finding that BIPI did not believe, in good faith, that it had a legitimate reason to terminate Ramírez. We recognize that "the employer's good faith belief is not automatically conclusive" on the issue of pretext. However, there is also no evidence in the record to support a jury finding that the articulated reason, though honestly held, "constituted discrimination (e.g., stereotyping)." Id. at 45-46.

**E.      Conclusion**

In determining whether a defendant is entitled to summary judgment on an ADEA claim, we must consider, inter alia, "the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 149 (2000). As we have discussed, Ramírez has offered virtually no proof that BIPI's explanation for his termination is false. He has not presented sufficient evidence to support a jury finding that the territory reorganization was motivated by a discriminatory animus or that he suffered adverse disparate treatment as a result of his age. Nor are the comments by García and Hernández probative of discriminatory animus, without evidence that they were involved in the decision to terminate him. Moreover, there is no support in the record for Ramírez's claim

that BIPI fabricated the physicians' statements or obtained them after it had decided to terminate him based on his age.

In short, the only evidence of a discriminatory motive that Ramírez has unearthed are two comments by Díaz in early 2000 that a jury could interpret to evince animus based on age. However, Ramírez was not terminated until more than eighteen months after Díaz made the comments at issue, and at the time of his termination, Ruiz, who is several years older than Ramírez, was still employed at the company. Against this background, we conclude that Díaz's comments, standing alone, are insufficient to support a finding that Ramírez was terminated because of his age. The district court was correct to grant summary judgment to BIPI on the ADEA discrimination claim.

**IV.**

Ramírez challenges the court's grant of summary judgment on his claim that he was terminated in retaliation for filing a discrimination complaint with the Anti-Discrimination Unit of the Puerto Rico Department of Labor (ADU). We review the court's summary judgment ruling de novo. Gonzalez-Pina, 407 F.3d at 431.

In addition to prohibiting age discrimination, the ADEA also protects individuals who invoke the statute's protections. See 29 U.S.C. § 623(d) ("It shall be unlawful for an employer to discriminate against any of his employees . . . because such individual . . . has opposed any practice made unlawful by this

section, or . . . made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation under this chapter."). Where there is no direct evidence of retaliation, our analysis of a claim under § 623(d) closely tracks the McDonnell Douglas framework. First, "the plaintiff must make a prima facie showing that (i) he engaged in ADEA-protected conduct, (ii) he was thereafter subjected to an adverse employment action, and (iii) a causal connection existed between the protected conduct and the adverse action." Mesnick, 950 F.2d at 827.[20] If the plaintiff makes a prima facie showing of retaliation, "the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its employment decision." Id. Finally, if the defendant presents such a reason, "the ultimate burden falls on the plaintiff to show that the employer's proffered reason is a pretext masking retaliation for the employee's opposition to a practice cast into doubt by the ADEA." Id. As we emphasized in Mesnick, the "critical inquiry [is] whether the aggregate evidence of pretext and retaliatory animus suffices to make out a jury question." Id.

---

[20]It is not essential to a plaintiff's prima facie case that the underlying conduct actually constitute an ADEA violation. Rather, "[i]t is enough that the plaintiff had a reasonable, good-faith belief that a violation occurred; that he acted on it; that the employer knew of the plaintiff's conduct; and that the employer lashed out in consequence of it." Mesnick, 950 F.2d at 827.

Ramírez filed a complaint with the ADU on June 13, 2001, asserting that he had been subjected to "a series of harassing acts . . . due to [his] age."[21] He was terminated approximately two months later, on August 15, 2001. Accordingly, the district court found, and BIPI has conceded, that Ramírez established the first two elements of the prima facie showing described in Mesnick, namely that he engaged in ADEA-protected conduct (i.e., filing a complaint of age discrimination) and that he subsequently suffered an adverse employment action (i.e., termination). The district court concluded, however, that Ramírez's prima facie case faltered on the third element, namely the existence of a causal connection between the filing of the ADU claim and the subsequent termination. The court found that the temporal proximity between the two events -- two months -- was "insufficient, standing alone, to establish a causal connection." The court further held that even assuming arguendo that Ramírez established a prima facie case, BIPI would still be entitled to summary judgment on the retaliation claim because it "offered enough evidence to suggest that its decision to fire Plaintiff was based on Plaintiff's alleged malfeasance

---

[21]In his ADU complaint, Ramírez also alleged that he had been "the victim of discrimination due to national origin and/or race -- Puerto Rican -- since the company provides higher salary raises and better terms and conditions of employment . . . to its predominantly white and North American employees in the United States." That aspect of Ramírez's claim is not part of this suit.

. . . [and] Plaintiff has not offered any evidence to suggest that Defendant's actions were pretextual."

On appeal, Ramírez emphasizes that although his superiors had concerns about his conduct by January 2000, they "waited until August 2001 to discharge him, two months after he filed a charge of discrimination before the [ADU]." While Ramírez's superiors speculated that he was engaging in improper "oversampling" as early as January 2000, however, the physician statements that BIPI cites as the basis for Ramírez's termination were not documented until May 10, 2001. Ramírez filed his complaint with the ADU one month later. He therefore was terminated three months after Wood received the physician complaints and two months after engaging in ADEA-protected activity. The fact that Wood terminated Ramírez after he filed his ADU claim rather than before does not, standing alone, establish a causal connection between the ADU complaint and the termination. "[C]hronological proximity does not by itself establish causality, particularly if '[t]he larger picture undercuts any claim of causation.'" Wright v. CompUSA, Inc., 352 F.3d 472, 478 (1st Cir. 2003).

Ramírez's other causation argument rests on the fact that he was terminated without notice instead of being subjected to less severe discipline first, as he asserts would have been consistent with company policies. As we have already discussed, however, Ramírez's termination was not inconsistent with company policy, nor

has he provided evidence that other employees were subjected to less severe discipline (or no discipline at all) based on similar conduct. The fact that he was terminated, rather than merely reprimanded, two months after filing an ADU complaint does not establish that the termination was causally linked to the complaint.

Nor has Ramírez offered evidence to support a finding that BIPI's articulated reason for the termination -- i.e., violations of company sampling policy and the PDMA -- was a pretext for retaliation. He has not, for example, pointed to any "comments by the employer which intimate a retaliatory mindset" or demonstrated that he was subjected to differential treatment after filing the ADU complaint. Mesnick, 950 F.2d at 828.[22] Ramírez does attempt to demonstrate pretext by arguing that the physicians' statements were inadmissible hearsay and thus BIPI has not advanced a legitimate, non-discriminatory reason for his termination. However, as we have already concluded, the physicians' statements were admissible.

---

[22]To be sure, Ramírez alleges disparate treatment in the fact that he was terminated instead of being subjected to less severe discipline. As we have discussed, however, Ramírez cites no evidence to support his claim that other employees were disciplined less severely, if at all, for similar violations. A party opposing summary judgment "may not rest upon . . . mere allegations." Fed. R. Civ. P. 56(e).

In short, Ramírez has not "present[ed] evidence from which a reasonable jury could infer that [his] employer retaliated against him for engaging in ADEA-protected activity."  Id.  We therefore conclude that the district court was correct to award summary judgment to BIPI on the retaliation claim.

**V.**

For the foregoing reasons, we hold that the district court did not abuse its discretion in handling the discovery issues surrounding the physicians' statements or in denying Ramírez's motion in limine to exclude Ribiero's sales report and the physicians' statements, and that BIPI was entitled to summary judgment on both the age discrimination and retaliation claims.[23] The judgment of the district court is **affirmed.**

**So ordered.**

---

[23]Upon granting summary judgment on the age discrimination and retaliation claims, the district court ordered the dismissal of the entire case.  Ramírez has not appealed the resulting dismissal of his state law claims, on which the district court did not specifically rule.