Revised September 28, 2000

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

-------------------

No. 99-60448

-------------------

DEBORAH H. HARDIN,

Plaintiff - Appellee-Cross-Appellant,

versus

CATERPILLAR, INC.

Defendant - Appellant-Cross-Appellee.

-------------------

Appeals from the United States District Court
For the Northern District of Mississippi

-------------------

September 12, 2000

Before JOLLY, HIGGINBOTHAM, and EMILIO M. GARZA, Circuit Judges.

PATRICK E. HIGGINBOTHAM:

Approximately three and a half months after Caterpillar fired Deborah Hardin, she filed suit against Caterpillar asserting claims under the Family Medical Leave Act, the Pregnancy Discrimination Act of Title VII, and a claim under the Americans with Disabilities Act. The latter claim was dismissed, and the remaining claims were tried to a jury in Mississippi. The jury returned a verdict for Hardin, awarding her $55,000 in lost wages from the FMLA claim and $45,000 for the PDA violation. The district court granted Hardin's

motion for liquidated damages under FMLA but denied her motion for reinstatement or front pay. By agreement of the parties, it limited Hardin's claim for lost wages to the sum of $22,558. It then awarded the same sum in liquidated damages, together with $45,000 for mental anxiety, all with interest. Hardin and Caterpillar appeal.

Caterpillar argues insufficiency of evidence and defends the other rulings of the trial court. Hardin complains that the district court erred in not awarding reinstatement or front pay. The district court refused, pointing out that in the pre-trial order the plaintiff only asserted "a claim for actual, punitive and liquidated damages for violations of Title VII and the FMLA" and made no claim for reinstatement or front pay. The court further observed that the issues were not tried by consent.

I

After oral argument, we are persuaded that the judgment below must be affirmed in all respects, except for the district court's dismissal of the claim for punitive damages. A final pre-trial order controls the issues to be tried, and the district court acted within its discretion in refusing reinstatement or front pay for the reasons it gave. We reject summarily Caterpillar's contention that the verdict is not supported by the evidence. We pause only to treat the more difficult issue of punitive damages.

II

2

Hardin at all times asserted a claim for punitive damages. The district court acting without the benefit of the decision of the Supreme Court in Kolstad v. American Dental Association, 527 U.S. 526, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999), declined to submit the issue to the jury.  Kolstad explained that there was no requirement of egregiousness, and the plaintiff Hardin points to that ruling.  It held that compensatory and punitive damages are limited to acts of intentional discrimination (Section 1981A(a)(1)) done with malice or reckless indifference.  The court in Kolstad further observed, "... in the punitive damages context, an employer may not be vicariously liable for the discriminatory employment decisions of managerial agents where these decisions are contrary to the employer's 'good-faith efforts to comply with Title VII,'" 119 S.Ct. 2118, 2129, (quoting Kolstad, 139 F.3d 958, 974 (D.C. Cir. 1998) (Tatel, J., dissenting)).

1

In refusing to submit punitive damages, the trial judge made explicit reference to Deffenbaugh I.  Deffenbaugh-Williams v. Wal-Mart Stores, Inc., 156 F.3d 581, 592-94 (5th Cir. 1998).  We later took Deffenbaugh I en banc and reinstated the panel opinion except its treatment of punitive damages.  We left to the panel the task of applying Kolstad's treatment of punitive damages.  Williams v. Wal-Mart Stores, Inc., 182 F.3d 333 (5th Cir. 1999) (en banc).

Kolstad made clear that malice did not require the proof of "egregious" conduct.  In this respect it changed nothing in

3

Deffenbaugh I on which the district court relied. Kolstad also clarified that punitive damages would not ordinarily be imputed to an employer if the discriminatory acts upon which they were predicated were contrary to good faith efforts of the employer to prevent such conduct. This was a change from Deffenbaugh I. It is unclear whether when the district court turned to the question of punitive damages, it considered evidence of the defendant's efforts to prohibit discriminatory acts by its policy statements, manuals, and such. Nonetheless, Kolstad's announcement of the rules for attributing malicious or recklessly indifferent conduct to an employer could not have injured Ms. Hardin. The new rules were more favorable to Caterpillar than Deffenbaugh I's approach, applied by the district court. Indeed, these new rules likely reinforce the decision of the trial court to not submit punitive damages. Yet, we cannot apply for the first time on appeal their fact-based inquiries into Caterpillar's good faith in reviewing the decision to not submit punitive damages to the jury.[1] Regardless, there was no error in refusing to submit punitive damages if, imputation to Caterpillar aside, the question of whether

---

[1] See Deffenbaugh-Williams v. Wal-mart Stores, Inc., 188 F.3d 278, 282-84 (5th Cir. 1999). Caterpillar could not, absent timely objection at trial, deploy Kolstad in an attack upon a punitive damage award against it. If punitive damages are to be otherwise considered afresh, Kolstad must be part of that mix. Caterpillar offered significant evidence of good faith efforts. It is true that in awarding liquidated damages under FMLA, the district court found that Caterpillar did not prove it acted in good faith. It is not clear whether Caterpillar's corporate policy directed toward enforcement of FMLA was considered in that decision.

4

Caterpillar employees acted with malice or reckless indifference toward Ms. Hardin did not raise genuine issues of material fact. We turn to that question.

2

First, two caveats: not every sufficient proof of pretext and discrimination is sufficient proof of malice or reckless indifference. Nor is there a useful litmus for marking the point at which proof of violation sufficient to impose liability becomes sufficient to also support a finding of malice or reckless indifference.

3

The district court did not explain its decision further than to say that the case was different from that in Deffenbaugh I. Kolstad explained the meaning of malice and reckless indifference drawing on its decision in Smith v. Wade, 461 U.S. 30 (1983).

> While the Smith court determined that it was unnecessary to show actual malice to qualify for a punitive award . . . its intent standard, at a minimum, required recklessness in its subjective form. The court referred to a "subjective consciousness" of a risk of injury or illegality and a "criminal indifference to civil obligations."

Id. at 2125. The court further relied upon Professor McCormick's statement that "a positive element of conscious wrongdoing is always required." Id. at 2126.

With these standards in mind, we are persuaded that if the jury credited Ms. Hardin's version of the events over those of Caterpillar's representatives, a reasonable juror could conclude

5

that the representatives were either lying or consciously indifferent to the truth and the legality of their acts.

There was direct evidence that Ms. Hardin was a good worker and that she was fired because she was pregnant. Although Caterpillar asserts a history of difficulties and comments by Ms. Hardin's supervisor, the jury could conclude that she was a good worker who held her own in an overwhelmingly male work environment. Ms. Hardin's testimony depicts a management that was unreceptive to pregnancy and illness claims. Her personnel manager, Gayra Quinn, and Rick Mercer, the plant manager at Caterpillar's Prentiss facility, apparently told workers that doctor's excuses were "a dime a dozen" and "not worth the paper they were printed on." Although Caterpillar may see this as a proper response to abuse by the work force of rules regarding absenteeism, the jury may see it in the context of the events here, as expressing hostility toward women working in a team environment facing a risk of pregnancy. According to Ms. Hardin, prior to the birth of her first child in 1995, she also faced criticism from management personnel about her pregnancy interfering with her work. She testified that Manager Jeff Vatalaro even required Ms. Hardin to get his permission before going to the bathroom – a requirement not placed on the plant's male employees.[2] Moreover, she recalled that while pregnant in 1997, her supervisor, Dale Kendrick, told her that her earlier

_____

[2]Ms. Hardin's pregnancy induced routine bouts of nausea and vomiting, requiring frequent use of the bathroom.

6

pregnancy had been detrimental to her work and that she needed to "pull her end" of the team's responsibilities.

Caterpillar contended at trial that Ms. Hardin failed to produce required documentation of the medical needs associated with her pregnancy. Ms. Hardin maintained that she did so and Caterpillar's assertion was both false and a pretext for its true purpose. She testified that Wallace Hurley of the personnel department called her late on Friday the 14th, 1997, advising that she needed more documentation from her doctor; that she told him she would see her doctor on Monday the 17th. Hardin testified that Hurley told her that he would be out of town the following week and she should send it to the office. She explained that she asked her doctor on Monday the 17th to send the information to Caterpillar. Caterpillar however mailed her a letter on Tuesday the 18th terminating her employment for "being habitually tardy or absent from work without prior notification."

She testified that when she asked why she was being terminated, she was referred to Chris Glynn, the plant manager, and met with him on March 24th. Ms. Hardin testified that although Glynn admitted at the meeting that he had talked to her doctor, he told her that she was being fired for lack of documentation. Yet if her testimony be credited, she had earlier left copies of "everything she had" with Dale Kendrick, her supervisor. The plant manager's later drafted memorandum of this meeting with Ms. Hardin characterized the meeting as an appeal of discharge. It recited

7

that Ms. Hardin had been fired for being absent without leave.  The memorandum also related that the date of discharge was February 25th, 1997, rather than March 8, 1997.

Caterpillar's defense also ran into problems in the face of cross-examination.  It tendered a similarly situated employee, but that effort imploded at trial with the disclosure that the tendered comparable was indeed AWOL – he was in jail, or likely there.  This stretch to use this employee to prove its evenhandedness left the jury free to conclude that only Ms. Hardin received this treatment. In sum, Caterpillar and Ms. Hardin offered conflicting interpretations of the events leading to her discharge.  But if Ms. Hardin be fully credited, a reasonable juror might conclude that she faced lying and deceit calculated to rid the plant of a pregnant worker.  But even this conclusion is not here a complete answer.

### III

We are urged to reverse the decision not to submit punitive damages to the jury by examining the evidence in the artificial legal lab we find ourselves in, post-Kolstad, an artificiality created by the case's procedural position and developing law.  The step up from proof sufficient to prove intentional discrimination to proof of malice or reckless indifferent conduct of employees is much shorter in a regime that would automatically impute those acts to an employer than in the regime post-Kolstad, at least where

8

there is evidence that the accused conduct of employees contravenes corporate policy.

In short, this issue of whether the acts of the employer were malicious or indifferent, stripped of <u>Kolstad</u>'s rules of attribution, is sufficiently close that we are persuaded that it should be decided by the district court in the first instance and that any new trial must be with the benefit of <u>Kolstad</u>. While it seems doubtful that the evidence so considered will warrant submission of the claim for punitive damages from the corporation, that decision ought be first made by the trial judge. Should the district court reach a different conclusion – and find that the issue should have gone to a jury, it will face a second difficulty to which we now turn.

IV

Hardin wants a new trial at which the issue of punitive damages alone will be tried. Remanding for a trial of punitive damages alone, however, is not so simple. The difficulty inheres in the very nature of a jury's decision making. The jury's decision on the claim of punitive damages would have been intertwined with its view of the facts determining liability and its award of damages for emotional injury, here $45,000. The amount to be awarded for emotional injury was not a sum of calculable costs. It was a jury's judgment – the classic black box decision said to be the quintessential jury question. This, in part, because its precise sum is not independently defensible, at

9

least not beyond a second judgment by a reviewer that it is not "unfair" or "unreasonable," or other equally tautological description.

A jury deciding whether to award punitive damages and their amount responds to the evidence of intentional acts essential here to the underlying finding of liability.  But intentional acts span a range of intensity, purpose, and foreseeability, a range that oscillates with the perceived level of emotional injury and its appropriate compensation.  Many legal systems reflect this linkage of actual and punitive damages in locating caps for punitive awards.  It is no answer that liability and damages here come in distinct legal capsules, because it is equally true that their expression in a verdict is a meld, a phenomenon providing essential anchors and focus to the open-ended character of punitive damages.  Courts have struggled with these difficulties in the context of issues revolving around Rule 42, FED. R. CIV. PROC., and the structure of trials in complex cases.

Separability issues also arise on appeal, such as today.  Even with the familiar bifurcation of liability and damages, similar difficulties of intertwined issues arise, such as attempting to try separately the question of liability and damages in a civil rights excessive force case.  See, e.g., Martin v. Heideman, 106 F.3d 1308 (6th Cir. 1997).

We are persuaded of the practical inseparability of the issues of intent, of damages for emotional injury, and of punitive damages

10

in this case, a conclusion we can and do reach without deciding that they are inseparable as a matter of law across all cases; and we do not suggest that punitive damages may not walk alone in other contexts.  See Black v. Fidelity & Guaranty Insurance Underwriters, Inc., 582 F.2d 984 (5th Cir. 1978).  Nor need we grapple with questions of a constitutional right to a single jury.  Arguably, any right to a single jury could not be asserted by Caterpillar here, it having insisted upon the dismissal of punitive damages at the first trial.  In any event, it would not follow from the fact that Caterpillar had no such constitutional right that Hardin has a right to try her claim for punitive damages to a jury free of the discipline and focus of facing decisions of liability and compensation for emotional injury.

Caught in these conflicting principles of entitlements to a jury trial of punitive damages and to a unitary trial, by our remand we leave the choice to Hardin of whether she wants a new trial, should the district court conclude that the question of punitive damages ought to have gone to the jury.

We do so because we are persuaded that any right of Hardin to jury trial of the punitive damages question does not extend to a trial of that issue divorced from the question of intentional acts and compensation for emotional injury.  Such a trial is too removed from the disciplinary regime of the framing subsidiary questions. So the district court cannot grant Hardin a trial of the issue of punitive damages without the price of risking her victory to date

11

by a second trial.  But that choice she must have if she has a right to try the issue to the jury.

V

We vacate the judgment below and remand the case to the district court with instructions to consider again the decision whether to submit punitive damages to a jury, this time with the benefit of <u>Kolstad</u>.  Should the district court reach a different conclusion, it must grant a new trial on all issues, including punitive damages, if a new trial is requested by the plaintiff.  If plaintiff elects not to try the case a second time, the district court will enter judgment awarding the damages for lost wages in the amount of $22,558, liquidated damages in that amount, together with $45,000 for mental anxiety, all with interest.

The judgment below is VACATED and the case is REMANDED with instructions.

12