# United States Court of Appeals
## For the First Circuit

Nos. 04-1902; 04-1969

JOHN MCDONOUGH,

Plaintiff, Appellee/Cross-Appellant,

v.

CITY OF QUINCY,

Defendant, Appellant/Cross-Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, U.S. District Judge]

Before

Howard, Circuit Judge,

Coffin and Campbell, Senior Circuit Judges.

David Grunebaum, with whom Jonathan C. Green and Monica E. Conyngham, City of Quincy Solicitor's Office were on brief, for appellant/cross-appellee.
Marisa A. Campagna for appellee/cross-appellant.

June 23, 2006

**HOWARD**, **Circuit Judge**.  A jury sitting in the District of Massachusetts found that the City of Quincy, Massachusetts, violated Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e, et seq., and Mass. Gen. Laws ch. 151B, by unlawfully retaliating against police officer John McDonough for assisting a fellow officer in pursuing an employment discrimination claim.  The jury awarded McDonough $300,000 in compensatory damages.  The parties cross-appealed.  The City challenges the verdict on several grounds, including that the action was barred by the claim preclusion doctrine and that the evidence was insufficient to support the verdict.  McDonough challenges the district court's refusal to instruct the jury on awarding punitive damages.  We reject the City's appeal but remand for further proceedings concerning punitive damages.

## I. Background

We present the facts in the light most favorable to the verdict, reserving certain details for the discussion.  See Grajales-Romero v. Am. Airlines, Inc., 194 F.3d 288, 292 (1st Cir. 1999).  McDonough joined the Quincy Police Department in 1969, subsequently held various ranks and was promoted to lieutenant in 1984.  In 1990 he was assigned to command the drug unit, where he has remained since.

In 1997, McDonough wrote to the then mayor of Quincy, James Sheets, questioning certain decisions made by police

department management.  In response, Sheets arranged a meeting with McDonough to discuss his grievances.  At the meeting, McDonough presented Sheets with a packet of materials highlighting his concerns.  One page of the packet included a compilation of allegations that McDonough had heard from other officers about sexual harassment by department employees against police officer Nancy Coletta.  Sheets took no action on the Coletta matter.

In late 1999, McDonough learned from other officers that Coletta was planning to file a sexual harassment lawsuit against the City.  McDonough did not know Coletta but wanted to help her pursue her claim.  He therefore provided Susan Perch, another officer who knew Coletta, with a copy of the page of allegations that he previously had presented to Sheets.  This page of allegations was eventually given to Coletta.

On April 25, 2000, the Massachusetts Commission Against Discrimination held a hearing on Coletta's claim against the City. Captain William Falco, then administrative assistant to Chief of Police Thomas Frane, attended the hearing at Frane's request.  At the hearing, Coletta presented the hearing officer with the page of allegations that McDonough had passed to her and mentioned McDonough's name.

After the hearing, Falco reported to Frane about the hearing and indicated that the "police department . . . or city had

-3-

some problems" because of Coletta's suit. Frane instructed Falco to investigate the matter further.

On May 5th, Falco contacted McDonough to discuss the page of allegations that Coletta had presented at the hearing. McDonough explained that he had given it to Mayor Sheets in 1997 and that, if Falco wanted to obtain a copy, he could contact the mayor's office. Falco unsuccessfully attempted to obtain the page from the mayor's office.

The members of the drug unit, including McDonough, worked the night shift and as compensation received fifteen percent higher pay than day-shift employees. Three days after Falco talked to McDonough about the Coletta matter, Frane reassigned McDonough to the day shift. As a result, McDonough lost the pay differential and was essentially stripped of his supervisory duties because the officers he supervised worked on the alternate shift. At the time that McDonough was reassigned, another officer was placed in the drug unit and assumed most of McDonough's supervisory responsibilities.

Shortly after the reassignment was announced, McDonough, who was on medical leave at that time, called Frane to inquire about the transfer. Frane told him that he had ordered it because McDonough had "trouble communicating." When McDonough objected to this characterization, Frane told him "in everyone's life a little rain must fall. You can always retire." On another occasion,

Frane told McDonough that he placed him on the day shift because several city councilors had indicated that they wanted to increase funding for the drug unit and that he wanted McDonough available to answer questions from the councilors. At trial, Frane testified that he had transferred McDonough as part of a department-wide reorganization and because he wanted to better integrate McDonough into the department's management team.

McDonough returned from his medical leave in August 2000 and assumed day-shift duties, where he "had no one to supervise" and "nothing to do." He served in this role without significant incident until March 8, 2001, when he signed several "court slips" (authorizing extra pay for officers required to attend court proceedings) for officers of the drug unit. McDonough learned the next day that the court slips that he had signed were denied because he no longer was authorized to sign such slips.

McDonough immediately called acting Chief of Police Terrence Kelly (Chief Frane was on a leave of absence after suffering a heart attack; he never returned to his position) to ask why the court slips were denied. Kelly told him that Captain Robert Crowley, McDonough's direct supervisor, had removed McDonough's signing authority. McDonough proceeded to explain that the drug unit was investigating Crowley for potential corruption and that Kelly therefore had to overrule Crowley's order. Kelly refused, and McDonough "very heatedly screamed at him" that he

would go to the newspapers and city hall if Kelly did not act. McDonough gave Kelly a short deadline to change his position before Kelly hung up the phone. After this conversation, Kelly described to Falco the heated exchange with McDonough and told Falco that he was afraid that McDonough might suffer a heart attack.[1] But Kelly took no immediate action.

Immediately thereafter, McDonough authored a letter to Kevin Madden, the director of personnel for the department, alerting him to the court-slip incident and other workplace grievances. McDonough stated that he had given relevant documents to another officer to be used in the case of his "sudden or suspicious death."

After Madden received this letter, he met with Kelly and Falco to discuss the situation. It was agreed that McDonough should be placed on paid administrative leave and that his service weapon should be taken pending a fitness-for-duty evaluation by a mental health provider.

After the meeting, Kelly and Falco summoned McDonough to Kelly's office to inform him that he was being placed on administrative leave. They then took his firearm and told him that he had to leave the police headquarters immediately and could not return unless and until he passed a mental health evaluation.

---

[1]It was well-known in the department that McDonough had a heart condition.

After McDonough was placed on leave, no one from the department checked to make sure that McDonough had no other weapons in his possession, contacted McDonough's family to alert them to the concerns about his mental health, or arranged to ensure that McDonough made it home safely.

McDonough subsequently met with a psychiatrist who concluded that McDonough was fit to return to his post. McDonough returned to his day-shift position in May 2001 and several weeks later was returned to the night shift by Falco, who in the interim had been appointed chief.

In October 2001, McDonough filed this action claiming that the City had retaliated against him by, inter alia, transferring him to the day shift and placing him on administrative leave. After a five-day trial, the court submitted the case to the jury but declined to allow the jury to consider awarding punitive damages. The jury returned a general verdict for McDonough and awarded him $300,000 in lost wages and emotional distress damages. The City moved for judgment as a matter of law on the ground that McDonough had not presented sufficient evidence to ground the jury's retaliation finding and, alternatively, moved to have the damage award remitted. The district court denied the motion and entered judgment.

## II. The City's Appeal

### A.      Claim Preclusion

The City asserts that McDonough's action should have been dismissed as it was barred under the claim preclusion doctrine as a result of an unsuccessful Massachusetts state court action that McDonough filed against the City in 1999.  In 1998, McDonough was passed over for promotion to police captain and subsequently sued the City in Massachusetts Superior Court, claiming that he had been denied the promotion in retaliation for his complaint to Sheets in 1997.  The case went to trial in 2003, and a state court judge entered judgment for the City at the close of McDonough's case-in-chief.  The City argues that the state and federal actions are identical and that the federal action is therefore barred.  It bases this argument on a foundational assertion that both cases center on the page of Coletta allegations that McDonough first presented to Sheets at their 1997 meeting.

The district court rejected this argument on the ground that the federal and state actions are distinct.  The court viewed the state action as based primarily on the alleged retaliatory conduct by Sheets after the 1997 meeting, while the federal action is based primarily on retaliation perpetrated by members of the department after McDonough helped Coletta in 1999.  We review this determination de novo.  See  Maher v. GSI Lumonics, Inc., 433 F.3d 123, 126 (1st Cir. 2005).

"Under federal law, a federal court must give to a state-court judgment the same preclusive effect as would be given that judgment under the law of the state in which that judgment was entered." Torromeo v. Fremont, 438 F.3d 113, 115 (1st Cir. 2006) (internal citations omitted). Thus, the effect the Massachusetts court's final judgment has on McDonough's federal action is determined by applying the Massachusetts law of claim preclusion. Id.

Claim preclusion doctrine in Massachusetts "prohibits the maintenance of an action based on the same claim that was the subject of an earlier action between the same parties or their privies." Bagley v. Moxley, 555 N.E.2d 229, 231 (Mass. 1990). "[C]laim preclusion makes a valid final judgment conclusive on the parties or privies, and bars further litigation of all matters that were or should have been adjudicated in the action." Id. "There are three essential elements to the doctrine of claim preclusion: (1) the identity or privity of the parties to the present and prior actions; (2) identity of the cause[s] of action; and (3) a prior final judgment on the merits." Bui v. Ma, 818 N.E.2d 572, 579 (Mass. App. Ct. 2004). Causes of action are identical if they "derive[] from the same transaction or series of connected transactions." TLT Const. Corp. v. A. Anthony Tappe, 716 N.E.2d 1044, 1052 (Mass. App. Ct. 1999). "What factual grouping constitutes a transaction is to be determined pragmatically, giving

-9-

weight to such factors as whether the facts are related in time, space and origin or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations." Mancuso v. Kinchla, 806 N.E.2d 427, 438 (Mass. App. Ct. 2004).

There is no question that the parties to the state and federal actions are the same and that the state action resulted in a final judgment on the merits adverse to McDonough. Thus, the only issue is whether the causes of action share sufficient identity.

We agree with the district court that they do not. The transaction on which the state action was based was McDonough's failure to be appointed captain in 1998, which he attributed to retaliation orchestrated by Sheets for exercising his First Amendment rights in 1997. The transactions on which the federal suit is based were McDonough's transfer and his placement on administrative leave, which he claims were ordered by members of the department after they learned in 2000 that he had assisted Coletta in her lawsuit. McDonough's suits against the City were premised on separate acts of protected conduct that occurred years apart. Moreover, the allegedly retaliatory actions were ordered by different City agents over a several year period. These differences support the district court's ruling that the federal action is not barred. See, e.g., Gonzalez-Pina v. Rodriguez, 407

F.3d 425, 430 (1st Cir. 2005) (concluding, in an employment discrimination case, that "subsequent conduct, even if it is of the same nature as the conduct complained of in a prior lawsuit, may give rise to an entirely separate cause of action"); Herrmann v. Cencom Cable Assocs. Inc., 999 F.2d 223, 226 (7th Cir. 1993) (Posner, J.) (concluding that claim preclusion did not bar two tangentially related employment claims because the essential facts underlying the claims were distinct); Manning v. City of Auburn, 953 F.2d 1355, 1359 (11th Cir. 1992) (ruling that claim preclusion did not bar a second employment discrimination claim, where the facts underlying the second suit had not occurred when the first suit was filed).[2]

The page of allegations that McDonough gave to Sheets was, of course, relevant evidence in each case. But the district court correctly recognized that this is too tenuous a connection to warrant a finding of claim preclusion and to deprive McDonough of his day in court. See Herrmann, 999 F.2d at 226 (refusing to find claim preclusion when the claims had only limited shared facts); see also Andersen v. Chrysler Corp., 99 F.3d 846, 853 (7th Cir. 1996) (cautioning that a claim preclusion analysis should not

---

[2]In addition, the causes of action do not present a convenient trial unit. The key witnesses for the state action were Sheets and McDonough, while the federal action required several department witnesses and substantial documentary evidence about police department procedure and policies. See Catullo v. Metzner, 834 F.2d 1075, 1078 (1st Cir. 1987).

proceed at too high a level of generality because of the risk of unfairly precluding a litigant from having her day in court).

### B. Sufficiency of the Evidence

The City argues that it was entitled to judgment as a matter of law because McDonough failed to present sufficient evidence to warrant the jury's retaliation finding. It claims that the evidence demonstrates, at most, that the actions taken against McDonough "were based on personal conflicts with [City] officials," and that such evidence is inadequate to sustain a retaliation verdict. The district court rejected this argument, concluding that there was sufficient proof from which a jury could infer that the City's actions against McDonough were motivated by retaliatory animus stemming from his assisting Coletta.

We review de novo the denial of the City's motion for judgment as a matter of law, see Marrero v. Goya of P.R., 304 F.3d 7, 14 (1st Cir. 2002), and we examine the evidence presented at trial in the light most favorable to McDonough. See White v. N.H. Dep't of Corr., 221 F.3d 254, 259 (1st Cir. 2000). We "may not consider the credibility of witnesses, resolve conflicts in testimony or evaluate the weight of the evidence." Katz v. City Metal Co., 87 F.3d 26, 28 (1st Cir. 1996). Our review "is weighted toward preservation of the jury's verdict, for we must affirm unless the evidence was so strongly and overwhelmingly inconsistent with the verdict[] that no reasonable jury could have returned

-12-

[it]." Crowley v. L.L. Bean, Inc., 303 F.3d 387, 393 (1st Cir. 2002).

The jury was instructed to consider McDonough's claim under the McDonnell-Douglas burden-shifting framework. See McDonnell-Douglas Corp. v. Green, 411 U.S. 792 (1973). Under McDonnell-Douglas, the plaintiff must make a prima facie showing that (i) he engaged in protected conduct, (ii) he was thereafter subject to an adverse employment action, and (iii) a causal connection exists between the protected conduct and the adverse action. See Ramirez Rodriguez v. Boehringer Ingelheim Pharmaceuticals, Inc., 425 F.3d 67, 84 (1st Cir. 2005). If the plaintiff makes this showing, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its employment decision. See id. Finally, if the defendant presents such a reason, the plaintiff must demonstrate that the defendant's proffered reason is pretext masking illegal retaliation. See id. Evidence that the defendant's reason was pretext may, but need not, ground a finding of liability. Fite v. Digital Equip. Corp., 232 F.3d 3, 7 (1st Cir. 2000).

The City has not presented in its main brief a developed argument that McDonough failed to establish a prima facie case of retaliation. It focuses instead on the evidence that McDonough presented to undermine the City's asserted reasons for taking the challenged employment actions. As discussed above, the jury was

-13-

presented with two adverse employment actions: McDonough's reassignment to the day shift and his placement on administrative leave. We consider whether McDonough presented sufficient evidence of pretext such that the jury could conclude that retaliation was the real motive for each of the challenged actions.[3]

Chief Frane ordered McDonough's transfer to the day shift within days of learning that McDonough had assisted Coletta in pursuing her sex discrimination claim. At trial, the City claimed that Frane's decision to transfer McDonough was part of a department-wide reorganization and that the timing was coincidental.

There is "no mechanical formula" for determining pretext, Che v. Mass. Bay Transp. Auth., 342 F.3d 31, 39 (1st Cir. 2003) (internal citation omitted), and we have recognized that pretext can be proven in many ways, see Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 55 (1st Cir. 2000). One way is for the plaintiff to show that the employer gave "different and arguably inconsistent explanations" for taking the adverse employment action. Dominguez-Cruz v. Suttle Caribe, Inc., 202 F.3d 424, 432 (1st Cir. 2000).

---

[3]The City does not argue that these actions were insufficient to establish a retaliation claim on the basis that they were not severe enough "to dissuade a reasonable worker from making or supporting a charge of discrimination." Burlington Northern & Santa Fe Railway v. White, 548 U.S. --, 2006 WL 1698953, at *10 (June 22, 2006).

-14-

Here, there was evidence that Frane provided several, arguably inconsistent, explanations for transferring McDonough. When McDonough first confronted Frane about the transfer, Frane told him that it was because he had "trouble communicating" and that, if he did not like it, he "could retire." Several months later, when McDonough again asked Frane why he had been transferred, Frane stated that "some city councilors wanted to put additional funding into the drug unit," and that the transfer was intended to help secure this funding. At trial, Frane testified that the transfer was part of a "major transformation" of the department and that it was designed to integrate McDonough into the department's management team. These shifting explanations provided a basis for the jury to conclude that the reason the City presented at trial was false.

Moreover, there was testimony from two police captains, who attended management meetings with Chief Frane just before the transfer, that there was no discussion of restructuring the drug unit. The jury could have concluded that this evidence was inconsistent with the City's contention that the transfer decision was a part of a systemic restructuring process. See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000) (stating that a jury can find pretext where "the employer's proffered explanation is unworthy of credence").

-15-

There also was evidence from which the jury could have found pretext masking retaliation in the City's claim that it placed McDonough on administrative leave because it perceived him to be a safety risk. Acting Chief Kelly, the person who decided to place McDonough on leave, testified that it was common knowledge that McDonough often became highly emotional but that he would quickly calm down. This testimony was given during Kelly's account of his conversation with McDonough that led him to be primarily concerned that McDonough might have a heart attack. Kelly admitted that he did not perceive McDonough to be a safety threat when this conversation occurred. Moreover, no one in the department investigated McDonough's letter to Madden to determine the basis and motivation for his statements. From this evidence, the jury could infer that Kelly, Madden, and Falco used McDonough's phone call and letter to establish a pretextual safety rationale for the decision to put McDonough on administrative leave.

In addition, a jury could view the actions that Kelly and Falco took when they informed McDonough that he was being placed on leave as tending to undermine the asserted safety rationale. Falco testified that he was so concerned about the possibility of McDonough becoming violent that he wore a bullet-proof vest to the meeting at which Kelly informed McDonough of the decision to place him on leave. But Kelly did not take any such precautions for himself or his secretary who was sitting directly outside of the

-16-

door to the office in which the meeting was held. Nor did Kelly or Falco arrange to have an officer on alert in case the meeting turned violent. And, after the meeting, no one at the department checked to see if McDonough had other weapons in his possession, alerted McDonough's family that he was a potential danger to himself or others, or arranged to ensure that McDonough traveled home safely. Indeed, the next contact between the department and McDonough did not occur until several days later, when someone from the department called to provide him with the details of his fitness-for-duty evaluation. Though the inference is not inevitable, the jury reasonably could have concluded that this is not how experienced police officers would have handled placing an officer on leave if they truly believed that he posed a safety risk. See Hodgens v. Gen. Dynamics Corp., 144 F.3d 151, 167 (1st Cir. 1998) (stating that pretext may be proven by showing "weaknesses, implausibilities, incoherencies, or contradictions in the employer's proffered legitimate reasons").

In assessing pretext, "everything depends on the individual facts." Thomas v. Eastman Kodak Co., 183 F.3d 38, 57 (1st Cir. 1999). As such, we are "particularly cautious" about setting aside a jury's determinations that an employer's proffered explanation was pretext. Hodgens, 144 F.3d at 167. "Determinations of motive and intent, particularly in discrimination cases, are questions better suited for the jury."

-17-

Mulero-Rodriguez v. Ponte, 98 F.3d 670, 677 (1st Cir. 1996).  While the jury could have accepted the City's explanations for its actions, we cannot say that it was irrational for the jury to have concluded that the explanations were pretextual and that retaliation was the motivation for the City's actions.[4]

## C.       Trial-Error Claims

### 1.    Evidentiary Claims

The City challenges several evidentiary rulings.  We review these claims for an abuse of discretion.  See Ramirez v. Debs-Elias, 407 F.3d 444, 449 (1st Cir. 2005).   Erroneous evidentiary rulings are harmless if it is highly probable that the error did not affect the outcome of the case.  See Rodriguez-Hernandez v. Miranda-Velez, 132 F.3d 848, 855 (1st Cir. 1998).

The City's first claim is that the district court abused its discretion by declining to allow it to introduce evidence that McDonough had lost his previous lawsuit against the City.[5]  See supra at 8.   The City argues that this evidence was relevant because it showed that McDonough was litigious and had a history of bringing meritless lawsuits.

---

[4]We also reject the City's contention that we should order a new trial.  As discussed above, the evidence was adequate for the jury to find retaliation.  See Marrero, 304 F.3d at 14 (stating that a new trial should only be ordered if "the outcome is against the clear weight of the evidence such that upholding the verdict will result in a miscarriage of justice").

[5]The court did allow the City to introduce the fact that there was a prior lawsuit between McDonough and the City.

Because the "charge of litigiousness is a serious one, likely to result in undue prejudice against the party charged[,]" Outley v. City of New York, 837 F.2d 587, 592 (2d Cir. 1988), ordinarily proof that the plaintiff filed prior similar lawsuits is admissible to show the plaintiff's litigiousness only if there is also evidence that the prior lawsuits were fraudulently filed, see McCormick on Evidence, § 196 at 691 (5th ed. 1999). Here, there is evidence that McDonough filed one prior lawsuit against the City after he was denied a promotion. But, while that lawsuit was unsuccessful, there is nothing suggesting that it was fraudulently filed. See Mathis v. Phillips Chevrolet, Inc., 269 F.3d 771, 776-77 (7th Cir. 2001) (concluding that there was no abuse of discretion in declining to admit evidence of prior lawsuits where the evidence was in dispute whether the prior suits were fraudulently brought or merely unsuccessful). The district court did not abuse its discretion in excluding evidence about the result of McDonough's prior lawsuit against the City.

The City next contends that the district court improperly precluded it from questioning McDonough about his contentious relationship with the mayor and the police department. We disagree with the City's characterization of the district court's ruling. The City was permitted to ask McDonough about his strained relationships with certain department officials, to introduce the fact that McDonough had sued the City on a prior occasion, and to

-19-

present documents highlighting various points of dispute between McDonough and the department. The ruling in question involved the court telling the City to "move on" after counsel had asked McDonough several repetitive questions about his relationship with Captain Falco.

Under Fed. R. Evid. 403, the district court retains discretion to "prevent the needless presentation of cumulative evidence." Donovan v. Burger King Corp., 672 F.2d 221, 225 (1st Cir. 1982). The court provided the City with ample opportunity to highlight McDonough's sour relationship with the City. It was within the court's discretion to draw the line where it did.

The City's third evidentiary argument is that the district court abused its discretion by permitting McDonough to present a chalk to the jury stating that Coletta had settled her lawsuit for $500,000. Even if this information should not have been presented to the jury, the City did not timely object to the chalk, and the court sua sponte explained that the jury should not infer anything from the amount of the Coletta settlement. "We have held, [that] the potential for prejudice . . . [often] can be satisfactorily dispelled by appropriate curative instructions," as "[j]urors are presumed to follow such instructions, except in extreme cases." United States v. Richardson, 421 F.3d 17, 41 (1st Cir. 2005). Given the tangential relevance of the Coletta

settlement and the court's timely limiting instruction, we are confident that the verdict was not swayed by the chalk.

Finally the City argues the district court wrongly admitted out-of-court statements by Falco and Madden concerning the decision to place McDonough on administrative leave. The City contends that these statements were hearsay and could not be received as admissions under Fed. R. Evid. 801(d)(2)(D) because the declarants were not "policymakers," (which the City would limit in this case to the chief of police and the mayor).

For a statement to be an admission under Fed. R. Evid. 801(d)(2)(D), it must be made by a party, a party's agent, or a servant within the scope of an agency or employment. See Gomez v. Rivera Rodriquez, 344 F.3d 103, 116 (1st Cir. 2003). The employee's station within the organization is not relevant to the Rule 801(d)(2) analysis. See Woodman v. Haemonetics Corp., 51 F.3d 1087, 1093-94 (1st Cir. 1995) (rejecting argument that statements by "first-line supervisor" with no firing authority could not be admissions under Rule 801(d)(2)(D)). The relevant inquiry is whether the employee's statement was made within the scope of employment. See id.

Here, there is no question that Falco and Madden made the challenged statements within the scope of their employment. Both were department officials involved in personnel management, and the statements related to a possible personnel action against

McDonough.  See id. (concluding that statement by employee involved in the plaintiff's termination was admissible under Fed. R. Evid. 801(d)(2)(D)).  The statements were properly admitted.[6]

## 2.    Jury Instruction

In addition to challenging the transfer and leave decisions, McDonough presented evidence that he was subject to adverse employment actions by being denied the use of a department car, by not having his supervisory responsibility restored after he was returned to the night shift, and by being denied the authority to sign court slips.  After the close of the evidence, the district court directed a verdict for the City on these claims and only permitted the jury to consider the transfer and leave allegations. The City contends that the district court's charge did not adequately explain that McDonough's claim was limited to those allegations.  We review this claim for abuse of discretion.  See Sanchez-Lopez v. Fuentes-Pujols, 375 F.3d 121, 133 (1st Cir. 2004).

The court's instructions were more than adequate to explain the nature of McDonough's claims.  The court explained:

> [T]his  case  [is]  grounded  in  two
> incidents.    One,  the  transfer  of  Mr.

---

[6]The City also challenges the propriety of McDonough's closing argument.  It did not, however, object below, and therefore we review for plain error.  See Santos v. Sunrise Med. Ctr., 351 F.3d 587, 592-593 (1st Cir. 2003).  There was no such error, for there is no reason to think that any of the challenged statements came close to causing the City substantial prejudice.  See Smith v. Kmart Corp., 177 F.3d 19, 25-26 (1st Cir. 1999) (describing plain error as "a rare species in civil litigation").

-22-

> McDonough . . . from nights to days .
> . . and later on a determination that
> he was to surrender his firearms and stay
> on administrative leave until he went to
> a psychiatrist and was certified for
> duty in that period of time.

Later, the court instructed that "this case is about" McDonough being "taken from nights and placed on days" and being placed on "administrative leave." The instructions were more than sufficient to apprise the jury of the actionable theories.

### D. Damages

The City argues that the district court erred by declining to reduce McDonough's $300,000 damages award because the award was "grossly excessive" and "shocking to the conscience." We review the district court's denial of remittitur for an abuse of discretion. See Gasperini v. Ctr. for Humanities, Inc., 518 U.S. 415, 433 (1996). "We will not disturb an award of damages because it is extremely generous or because we think the damages are considerably less." Koster v. Trans World Airlines, 181 F.3d 24, 34 (1st Cir. 1999). Rather, the defendant must establish that the award "is so grossly disproportionate to any injury established by the evidence as to be unconscionable as a matter of law." Id.

The award in this case comprised both economic and emotional distress damages. McDonough lost some salary due to the City's actions, but acknowledges on appeal that the bulk of the award was for emotional distress. McDonough testified that he had been a Quincy police officer for over thirty years and that he

"loved [his] job."  In light of his commitment to his job as a police officer, McDonough claimed that the City's actions caused him  substantial humiliation and damage to his reputation.  As a result of this trauma, McDonough claimed that his relationship with his family suffered.  He testified that he became easily enraged at his grandchildren and was therefore no longer able to see them.  He also made his wife and sisters cry and cried himself on occasion.

McDonough's testimony is similar to the evidence in other cases where we have sustained comparable emotional distress awards against excessiveness challenges.  In Koster, for example, we allowed a $250,000 award where the plaintiff testified that the employer's conduct caused him to suffer anxiety and insomnia and damaged his family life.  Id. at 35-36.  Also in Rodriguez-Torres v. Caribbean Forms Mfg., Inc., 399 F.3d 52, 64 (1st Cir. 2005), we affirmed a $250,000 emotional distress award where the plaintiff testified that employment discrimination had caused her marriage to suffer and had put her into a depression "for quite some time."  In neither of those cases did the plaintiff seek medical treatment or have long-term physical symptoms as a result of the employer's actions.

After subtracting the economic damages that McDonough likely received, McDonough's emotional distress damages are very close to the awards that we permitted to stand in Koster and Rodriguez-Torres.  Given this precedent, the deferential standard of review, and "the esoteric nature of damages for emotional

-24-

distress," the award in this case, while high, is not so high that we should disturb it.[7] <u>Koster</u>, 181 F.3d at 36.

### III.  McDonough's Cross-Appeal

In his cross-appeal, McDonough argues that the district court erred by declining to instruct the jury on punitive damages. We review de novo the decision to decline a punitive damages instruction.  <u>See</u> <u>Che</u>, 342 F.3d at 41.

The Supreme Court established the standard for punitive damages under Title VII in <u>Kolstad</u> v. <u>American Dental Ass'n</u>, 527 U.S. 526 (1999).  Under <u>Kolstad</u>, a finding of intentional discrimination, which is the basis for a compensatory damages award, does not by itself establish a basis for awarding punitive damages.  527 U.S. at 534.  Rather, the plaintiff must make the

_____

[7]The City also contends that remittitur is required because the jury's $300,000 award was the maximum amount allowed under Title VII. 42 U.S.C. § 1981a(b)(3).  According to the City, only cases of extreme emotional distress can support an award at or near the Title VII cap.  This argument fails as "nothing in the language of the statute suggests that the cap on damages is intended . . . to alter the standard of judicial review for [damage] awards." <u>Luciano</u> v. <u>Olsten Corp.</u>, 110 F.3d 210, 221 (2d Cir. 1997).  "The statutory cap is not the limit of a damages spectrum, within which the judge might recalibrate the award given by the jury." <u>Deters</u> v. <u>Equifax Credit Inform. Servs., Inc.</u>, 202 F.3d 1262, 1273 (10th Cir. 2000); <u>EEOC</u> v. <u>W&O, Inc.</u>, 213 F.3d 600, 617 (11th Cir. 2000) (same).  In any event, McDonough was also awarded these damages under Mass. Gen. Laws ch. 151B, which does not have a damages cap. <u>See</u> <u>LaBonte</u> v. <u>Hutchins & Wheeler</u>, 678 N.E.2d 853, 862 (Mass. 1997).

additional showing that the employer acted with malice or reckless indifference to federally protected rights.[8]  Id. at 536.

The district court was therefore correct to treat the question of whether to instruct on punitive damages as distinct from whether there was sufficient evidence to allow the jury to find a Title VII violation.  See Che, 342 F.3d at 41.  But with the benefit of hindsight, we part ways with the district court in its conclusion that no reasonable jury could award punitive damages on the evidence presented.

The City argues that there was no evidence that its agents acted with reckless indifference to McDonough's Title VII rights because it presented legitimate non-retaliatory reasons for its actions.  This argument fails because the jury found that the City (through its agents) intentionally retaliated against McDonough and therefore rejected these reasons as the basis for the City's actions.  There was proof introduced by McDonough that the department published an anti-discrimination policy and provided

---

[8]The plaintiff must also show that there is a basis for imputing the bad acts of the employer's agent to the employer.  One way for the plaintiff to do this is by demonstrating that the agent was acting in a managerial capacity and committed the bad acts within the scope of his employment.  Id. at 542-43.  The employer may also avoid punitive damages liability by demonstrating that it has made good-faith efforts to comply with Title VII.  Id. at 545-46.  The City does not defend the district court's ruling by arguing either that the City's agents were not managerial employees acting within the scope of employment or that it sustained the good-faith compliance defense as a matter of law.  See Romano v. U-Haul Int'l, 233 F.3d 655, 670 (1st Cir. 2000) (the burden of demonstrating good-faith compliance is on the employer).

-26-

anti-discrimination training for its workforce.  See Rodriguez-Torres, 399 F.3d at 65 (stating that a punitive damages instruction was appropriate where the employer posted signs notifying employees about the anti-discrimination laws).[9]  Moreover, the retaliating employees were all high-ranking department officials involved in personnel management.  In light of the important role that Title VII plays in modern personnel management, we cannot conclude on this record that a reasonable jury would be compelled to find that these officials were unaware that retaliating against an employee for assisting with another employee's sexual harassment claim violates federal law.  See Powell v. Alexander, 391 F.3d 1, 20 (1st Cir. 2004) (stating that city solicitor, by nature of her position as an attorney, knew or should have known that retaliating against a public employee for filing a lawsuit is unlawful); DiMarco-Zappa v. Cabanillas, 238 F.3d 25, 38 (1st Cir. 2001) (stating that "the extent of federal statutory and constitutional law preventing discrimination . . . suggests that defendants had to know that such discrimination was illegal").  The evidence was therefore adequate for a rational jury to conclude that the City acted with reckless indifference to McDonough's Title VII rights.

As discussed above, malice and reckless indifference concern, not the employer's awareness that it is discriminating,

---

[9]Conversely, in an appropriate case, an employer might seek to admit this type of evidence on the question of the employer's good faith efforts at compliance, but that issue is not raised in this appeal.  See supra at n.8.

but the employer's knowledge that it is acting in violation of federal law. In Kolstad, the Supreme Court provided examples of situations in which intentional discrimination does not give rise to punitive damages. 527 U.S. at 536-37. Such situations may occur where the employer believes that it can lawfully discriminate, where the theory of discrimination is novel or poorly recognized, or where the employer believes that its discrimination falls within a statutory exception. Id.; see Farias v. Instructional Sys., Inc., 259 F.3d 91, 102 (2d Cir. 2001) (concluding that no punitive damages instruction was warranted under Kolstad in a retaliation case where the employer took the retaliatory act on advice of counsel that its conduct was lawful). A jury could conclude that the City's conduct falls into none of these categories. Accordingly, the jury should have been permitted to consider awarding punitive damages for the Title VII violation.[10]

This conclusion obliges us to consider the scope of our remand. McDonough contends that retrial must be limited to the punitive damages question. In support of this argument, he cites

---

[10]The result is the same under Mass. Gen. Laws ch. 151B. Punitive damages are authorized under Massachusetts law where the conduct is "outrageous because of the defendant's evil motive or his reckless indifference to the rights of others." Dartt v. Browning-Ferris Indus., 691 N.E.2d 526, 537 (Mass. 1998). For the reasons stated above, the evidence was sufficient for a jury to have concluded that the City acted with "reckless indifference" to McDonough's rights under the Massachusetts anti-discrimination laws. See id. (suggesting that punitive damages would have been warranted if there was evidence that employer knowingly violated an anti-discrimination law).

<u>Che</u>, 342 F.3d at 31, where we remanded solely for a retrial on punitive damages while allowing an emotional distress award to stand.

The Fifth Circuit has identified a potential problem in remanding a case for a trial limited solely to punitive damages where the first jury awarded emotional distress damages. <u>See</u> <u>Hardin</u> v. <u>Caterpillar, Inc.</u>, 227 F.3d 268, 272 (5th Cir. 2000). As the court explained, "the difficulty inheres in the very nature of a jury's decisionmaking." <u>Id.</u> Emotional distress damages are "the classic black box decision" because the precise sum of emotional damages cannot be independently quantified. <u>Id.</u> A jury awards such damages based on the degree of emotional harm that it believes that the plaintiff endured. But, especially where there is limited evidence of the plaintiff's physical symptoms, this award is closely linked to the jury's view concerning the defendant's unlawful conduct. <u>See</u> <u>id.</u> In other words, the jury's conclusion about the plaintiff's level of emotional trauma might well reflect its view concerning the reprehensibility of the defendant's conduct. <u>See</u> <u>id.</u> This potential overlap creates a risk that the plaintiff will recover twice for the reprehensibility of the defendant's conduct, if a second jury is allowed to consider only punitive damages. <u>See</u> <u>id.</u>; <u>see also</u> <u>Coastal Fuels of P.R.</u> v. <u>Caribbean Petroleum Co.</u>, 79 F.3d 182, 201 (1st Cir. 1996) ("The law abhors duplicative recoveries.").

This is not to say that a serious risk of double recovery exists in every case. In Che, for example, the emotional distress award was relatively low ($125,000), given the evidence of emotional injury. See 342 F.3d at 36 (the plaintiff suffered several diagnosed mental and physical disorders). In those circumstances, we determined that it was permissible to remand for a retrial limited to punitive damages. Id. at 34. But in reaching this conclusion, we recognized that this ruling was discretionary and that an "appellate court has broad discretion to remand for a new trial on all, or only some of the issues in the case." Id.

As Hardin recognized, whether a retrial limited to punitive damages would be fair must be decided case by case. See 227 F.3d at 273. The emotional distress award in this case, unlike the award in Che, was generous in light of the limited evidence that McDonough presented. Some reason for concern therefore exists, a concern that was absent in Che, that the high award may partly reflect punishment for what the jury may have concluded was the degree of reprehensibility of the City's conduct. See Horney v. Westfield Gage Co., 77 Fed. Appx. 24, 33 (1st Cir. 2003) (unpublished disposition) (concluding that a retrial limited to punitive damages may be unfair because the issues of intent, emotional distress damages, and punitive damages were "so intertwined"). That said, the district court is in a better position to make the judgment call because it viewed McDonough's evidence of emotional distress first hand. See id. at 33. If the

-30-

district court determines that the punitive damages issue should not be tried alone, the court should so indicate and provide McDonough the opportunity to accept the $300,000 compensatory award and withdraw his punitive damages claim.  See id.

### IV. Conclusion

The district court's ruling denying McDonough's request for an instruction on punitive damages is **reversed** and the case is **remanded** for further proceedings consistent with this opinion.  In all other respects, the court's rulings are **affirmed**.  Costs are taxed in favor of Appellee/Cross-Appellant John McDonough.

**So ordered**.